**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY BUHE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 5340** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **AMICA MUTUAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Timothy Buhe brings this suit against his former employer, defendant Amica

Mutual Insurance Company ("Amica"), asserting claims of discrimination under the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., as well as retaliatory discharge and

promissory estoppel under Illinois law. Defendant has moved for summary judgment. For the

following reasons, defendant's motion is granted in part and denied in part.

## BACKGROUND

This case arises from a grievous injury that plaintiff suffered in 2013 while working for

defendant, an insurance company, as a Senior Claims Adjuster. Plaintiff's job, which he had

held since 1994, was to investigate and adjust bodily injury claims stemming from auto accidents

or property damage claims made by homeowners. (Pl.'s LR 56.1 Resp. ¶¶ 3-5, ECF No. 36.) On

February 25, 2013, while adjusting a claim, plaintiff fell off of a policyholder's roof, injuring

himself. (*Id.* ¶ 16.) Plaintiff suffered a broken ankle that required two pins with internal

fixation, a torn meniscus in each knee, back pain, and a rotator cuff tear in his right shoulder.

(*Id.* ¶ 17.) Marvin Konkle, plaintiff's supervisor and the manager of the Lisle, Illinois branch

office out of which plaintiff was based, promptly provided notice of the incident to the Chubb Group of Insurance Companies, defendant's worker's compensation insurance carrier, and plaintiff filed a workers' compensation claim on June 5, 2013. (*Id.* ¶¶ 6-8, 20-21.) At the time, plaintiff was on a form of "probation," having received an Initial Warning of Termination in August 2012 for dress code violations; missing an after-hours call while on on-call duty; slowness in completing auto expense reports, estimates, and assignment downloads; and lax documentation in the claims files assigned to him. (*Id.* ¶ 44; *see* Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. at 118:23-128:22, ECF No. 32-3; *id.*, Buhe Dep. Ex. 9, ECF No. 32-6 at 18-19.)

On March 13, 2013, plaintiff requested an eight-week disability leave, beginning March 1 and ending on May 1, 2013. (Pl.'s LR 56.1 Resp. ¶ 22.) On May 14, 2013, plaintiff told John Grikas, who worked in human resources for defendant, that his injuries required multiple surgeries and he would probably be unable to return to work until late summer or early fall. (*Id.* ¶ 23.) On September 9, 2013, Grikas received an email from Ashley Sullivan, a "Relocation Coordinator" at Amica whose responsibilities included facilitating workers' compensation claims and exchanging information with Amica's workers' compensation insurers. (Def.'s LR 56.1 Stmt., Tab 5, Grikas Dep. Ex. 7, ECF No. 32-14 at 133; *see id.*, Tab 6, Sullivan Aff. ¶¶ 2-3.) Sullivan reported that she had discussed plaintiff's workers' compensation claim with the Chubb adjuster assigned to his case, and she had learned that plaintiff's treatment was not yet nearing a conclusion, as he would likely need additional surgeries. (*Id.*, Tab 5, Grikas Dep. Ex. 7, ECF No. 32-14 at 133.) Sullivan wrote, "I advised the adjuster that we can provide light duty work for Tim but she feels that the doctors will not agree to this. She asked if we can have Tim work from home. From my perspective, I don't recommend that we provide a work from home accommodation because this tends to pro-long [*sic*] the WC claim." (*Id.*)

On September 20, 2013, Grikas sent plaintiff a letter explaining that plaintiff had not yet indicated when he anticipated returning to work and had already taken six months of disability leave, the maximum amount allowed by defendant's employee handbook—although Grikas recognized that Amica could extend the leave, at its own discretion, based on its business needs and any information it might receive about plaintiff's anticipated return date. (*Id.* ¶ 27; *see also id.* ¶ 11 (quoting language of disability leave policy); Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. Ex. 18, September 20, 2013 Grikas Letter, ECF No. 32-6 at 51.)

On October 9, 2013, Grikas sent plaintiff a letter enclosing two copies of a Separation Agreement and Release, in which defendant offered plaintiff several months' pay in exchange for agreeing to terminate his employment with defendant and release any claims against Amica arising out of the employment relationship. (Pl.'s LR 56.1 Resp. ¶ 31; Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. Ex. 20, October 9, 2013 Grikas Letter, ECF No. 32-6 at 54.)

On October 16, 2013, plaintiff responded to the October 9 letter by sending an email to Grikas. (Pl's LR 56.1 Resp. ¶ 34.) The email states as follows:

> Thank you for your letter of October 9, 2013. My review of the Employee handbook notes that the maximum duration of a disability leave is GENERALLY six months. I am confused by this language. Does that mean that some employees are granted an extension of leave in addition to the six months?
>
> Can you please clarify the reason for my proposed termination noted in the Separation Agreement?
>
> I have been a loyal employee of Amica Mutual Insurance for 22 years. My unfortunate injuries causing my disability were due to being injured during the course of employment. I expected to be treated with good faith due to my years of service. I pray that I make a full recovery from my injuries after all surgeries and physical therapy are completed. I am currently being paid by workers compensation. Therefore, the cost of keeping me as a salaried employee is nominal. I have a family to provide for now and for many years to come.

I am respectfully requesting an extension to my leave in order to return to work in the near future with reasonable accommodations. I can not [*sic*] return to work until all surgical procedures are completed based on workers compensation laws.[1]

Please let me know if this is possible. Otherwise, I have questions regarding the proposed separation agreement. . . .

Sincerely,

Timothy J. Buhe

(Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. Ex. 21, October 16, 2013 Buhe Email, ECF No. 32-6 at 59.)

The following day, Grikas sent Buhe an email in response, in which he provided Buhe with the information Buhe had requested and admonished him, "the business needs of [your department and branch] are such that your position will be required to be filled unless your doctor(s) advises us that you may return to work in the near future." (*Id.*, Buhe Dep. Ex. 22, October 17, 2013 Grikas Email, ECF No. 32-6 at 60.) In bold typeface, Grikas requested, "By no later than Thursday, October 31, 2013, please provide us with updated medical documentation to provide an anticipated date for your return to work" because "Amica is under no obligation to allow you to have an open-ended Leave of Absence." (*Id.*)

On October 31, 2013, Buhe sent an email to Grikas outlining a time frame for his return to work and attaching a letter from his doctor. (*Id.*, Buhe Dep. Ex. 23, October 31, 2013 Buhe Email, ECF No. 32-6 at 61.) Buhe stressed that he was "not requesting an open ended leave of absence," he had been "a loyal employee for . . . 22 years," he needed to remain employed to provide health insurance for his sons, and he was "pray[ing]" that Amica "understands the situation" and would allow him to "finish [his] professional career over the next 20 years." (*Id.*)

---

[1] Buhe admitted at his deposition in this case that his claim in the October 16, 2013 email that he would not be able to return to work until after all his surgical procedures had been completed because of "workers compensation laws" was based on a "misconception of how workmen's comp worked." (Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep.at 170:15-16.)

The attached letter from plaintiff's doctor, Dr. Corcoran, stated that plaintiff was scheduled to undergo a surgical procedure on his right knee on November 11, 2013, from which plaintiff would need two to three months to fully recover. (*Id.*, Dr. Corcoran Letter, ECF No. 32-6 at 62.) However, plaintiff would be able to return to work on "light duty (sitting job[,] minimal walking) about 3-4 weeks" after the procedure, "if all goes as planned." (*Id.*) Dr. Corcoran also described a further surgical procedure, not yet scheduled, that plaintiff would have to undergo on his right shoulder, after plaintiff had fully recovered from his knee surgery, and which would require another lengthy recovery period. (*Id.*) After the shoulder surgery, plaintiff would be out another six to eight weeks, when he would be able to return on "some form of light duty." (*Id.*)

In early November 2013, Grikas and plaintiff spoke by phone. (Pl.'s LR 56.1 Resp. ¶ 39.) Grikas asked plaintiff if he intended to return to work on light duty three to four weeks after his upcoming knee surgery, and plantiff responded that that was his intention. (*Id.* ¶¶ 39-40.) In late November and early December, Grikas and Buhe traded voicemails about setting up a meeting between Buhe and Konkle. (*Id.* ¶ 52.) Buhe told Grikas on December 2, 2013, that he had an appointment with Dr. Corcoran the next day and he would have a better idea of exactly when he could return to work after that appointment, and he agreed to meet with Konkle on December 10, 2013. (*Id.* ¶ 53.)

On or about November 8, 2013, the Chubb adjuster contacted Ashley Sullivan to report that she had been conducting video surveillance on plaintiff in connection with his workers' compensation claim, and it appeared that plaintiff was actively working at Electra Mortgage Solutions ("EMS") while collecting workers' compensation benefits. (*Id.* ¶ 45.) Sullivan relayed this information to Grikas, and Grikas was able to verify some of it independently. (*Id.*

¶¶ 46-47, 50.)  Plaintiff had not previously told either his supervisor Konkle or Grikas about this outside employment at EMS.  (*Id.* ¶ 51.)

Plaintiff founded EMS in 2007 and currently serves as its president and owner.  (*Id.* ¶ 48.)  EMS's business is originating mortgage loans, and plaintiff has operated the business as a second job for a few hours per week since its founding, although he has had a second career as a mortgage loan originator for much longer, since 1999.  (Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. at 47:13-58:16.)  Plaintiff has held a mortgage loan originator license since 2005, when Illinois began to require mortgage originators to hold such licenses.  (Pl.'s LR 56.1 Resp. ¶ 49; Def.'s LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶ 5, ECF No. 38.)  Plaintiff sometimes sold mortgages to his co-workers, including his former supervisor, Gina Thies, and while he never received formal approval from Amica to work a second job as a mortgage loan originator, he believed it was generally common knowledge throughout the office at Amica that he was selling residential mortgages on the side.  (Def.'s LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 1-4; Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. at 47:13-58:16.)  He had previously received formal approval from Amica for separate outside employment: in 2005, Konkle learned that plaintiff had held outside employment at a furniture store for the previous eight years, and after discussing it with plaintiff, he made a note in plaintiff's personnel file that the outside employment did not present a conflict of interest.  (Def.'s LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶ 6.)

On December 9, 2013, Grikas sent Konkle an email, suggesting that he ask Buhe about his outside employment to verify whether the information he had received from Chubb was correct and whether plaintiff could shed additional light on the matter.  (Pl.'s LR 56.1 Resp. ¶ 54.)  At their meeting on December 10, Konkle asked plaintiff about his affiliation with EMS

and whether it complied with the company's policies on outside employment. (*Id.* ¶ 55.) Amica's Outside Employment policy states, "There may be occasions when, in our opinion, holding a second job would present a conflict of interest or adversely affect your performance at Amica. Our policy requires that we be notified if you have or are planning to obtain outside employment." (*Id.* ¶ 10.) Additionally, Amica maintains a Statement of Amica Claims policy, which states, "No employee shall hold a broker's, agent's, private detective's or realtor's license of any sort, or function as such, without express written approval by the Claims Executive Department, unless sponsored or otherwise approved in writing by the Office of the Secretary," and warns that violation of the policy is grounds for termination. (*Id.* ¶ 14.)

Plaintiff told Konkle that someone else oversaw the office activities of EMS for him and he did not view his license as a violation of the company policy against broker's licenses, but he became "leery" of discussing the matter without speaking with his attorney. (*Id.* ¶ 55.) On December 17, 2013, Konkle attempted to set up a second meeting with plaintiff, but plaintiff responded via email as follows:

> I have consulted with my attorney, Mr. Mark Hickey, regarding our previous . . . meeting and this most recent request for a meeting. I was told by Mr. Grikas that the last meeting . . . was to set up the light duty arrangement for my return to work once released by my physician. However, this was not discussed during our last meeting. The meeting focused on my current injury status and my affiliation with Electra Mortgage?
>
> Mr. Hickey and I would like to know the details and the particular items to be discussed at this new meeting request. My attorney prefers that all future conversations are in writing due to the fact that my employment status is under review. Additionally, we are requesting a copy of my full personnel file.

(*Id.* ¶ 58; Def.'s LR 56.1 Stmt., Tab 2, Buhe Dep. Ex. 25, December 17, 2013 Buhe Email, ECF No. 32-6 at 65-66.) On December 20, 2013, Konkle sent plaintiff a letter terminating plaintiff's

employment and citing his violation of defendant's Statement of Amica Claims policy and its Outside Employment policy. (Pl.'s LR 56.1 Resp. ¶ 54.)

In the last ten years, defendant has terminated two other employees for violating its policies on outside employment and holding an outside broker's license. (*Id.* ¶ 61.) It terminated Jerry Ann Norton in 2013 and Gia Henry in 2014 for using broker's licenses to sell insurance for other companies, and neither of them was disabled or had filed a workers' compensation claim against Amica. (*Id.* ¶¶ 62-64.) In fact, Amica has not involuntarily terminated any of the seven Amica employees who have filed workers' compensation claims against Amica in Buhe's region in the last five years. (*Id.* ¶ 65.) None of them litigated their claims by filing applications for adjustment with the Illinois Workers' Compensation Commission. (*Id.*)

In the case of Gia Henry, Amica learned that she held licenses to sell insurance for other companies, and in April 2014 it advised her that she would have to cancel these licenses to maintain employment with Amica. (Defs.' LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶ 32.) Henry told Amica that she would do so, but six months later, in October 2014, Amica learned that Henry still held the licenses. (*Id.* ¶¶ 32-33.) Henry admitted to Amica that she still held the licenses in question, and Amica terminated her for violating company policy, despite having been warned and given an opportunity to cure the violation. (*Id.* ¶¶ 33-35.)

In the case of Jerry Ann Norton, Amica learned that she was licensed to sell insurance products for other companies, but when confronted with this information, Norton told Amica three times that she was not actually using the outside licenses and she was not selling insurance for any other companies. (Pl.'s LR 56.1 Stmt. of Add'l Facts, Pl.'s Grp. Ex. 5, AMICA6396-97,

ECF No. 36-5 at 14-15.)  Dinari Dupont, a manager of some sort[2] in Norton's department, contacted Grikas by email to discuss the matter, writing, "My thoughts are that she terminate the appointments and provide us with evidence that the appointments have been discontinued. Otherwise, failure to do so presents a conflict of interest with Amica Life which may impact her employment." (Defs.' LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶ 36.)  Grikas responded that he would look into the matter further.  (*Id.* ¶ 37.)  After Amica learned that Norton was actively using her broker's license to sell life insurance for other companies, despite her representations to the contrary, it terminated her employment.  (Pl.'s LR 56.1 Resp. ¶ 62.)

Amica has allowed other employees to take leaves of absence in excess of six months, including Robert St. George, who took a leave of absence of approximately nine or ten months due to cancer and was administratively terminated when it transpired that he would be unable to return to work.  (Defs.' LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 30.)  Additionally, Michael Bossib was out on a disability leave of absence for approximately sixteen months in 2010 and 2011, as was Roberrt Pietroicz from late 2011 to early 2013.  (*Id.* ¶ 31.)  Robert Empoliti, Donna Seabury, Wray Kern, Dawn Fasciano, Susan Thompson, and Eric Ernst all took disability leaves of absence of between eight and fourteen months.  (*Id.*)

Plaintiff filed an Equal Opportunity Employment Commission/Illinois Department of Human Rights charge of discrimination and retaliation against defendant in October 2014, and he received a right to sue letter in April 2015.  (Compl., Exs. 1-2, ECF Nos. 1-1, 1-2.)

In June 2014, approximately three months prior to filing his administrative charge, plaintiff filed a Chapter 13 bankruptcy petition.  (Pl.'s LR 56.1 Resp. to Def.'s Suppl. Stmt. of Facts ¶ 1, ECF No. 54.)  He did not initially disclose any claims against Amica in his bankruptcy

---

[2] Dupont's exact position is unclear, although it is clear from the evidence that he held some sort of managerial or supervisory position in the Sales and Client Services department at Amica.

schedules, although he did disclose his workers' compensation claim in his Statement of Financial Affairs. (*Id.* ¶¶ 2, 3.) At the time he filed his bankruptcy petition, plaintiff had not yet filed his administrative charge in this case and did not know that he was required to schedule all pre-bankruptcy claims, even those he had not filed yet. (Pl.'s Suppl. Stmt. of Add'l Material Facts ¶ 3, ECF No. 54.) Although not all of Buhe's creditors filed claims, Buhe proposed, and the bankruptcy court approved, a plan that called for Buhe to pay 100% of his creditors' claims over the plan term. (*Id.* ¶ 1.) Buhe completed his payments in June 2016. (*Id.* ¶ 2.) The bankruptcy was discharged on July 26, 2016. (Pl.'s LR 56.1 Resp. to Def.'s Suppl. Stmt. of Facts ¶ 5.)

In August 2016, after learning of plaintiff's bankruptcy, Amica amended its answer and supplemented its motion for summary judgment[3] in this case to assert that plaintiff should be judicially estopped from asserting his claims against Amica based on his failure to disclose them to the bankruptcy court. On August 29, 2016, plaintiff filed amended schedules in his bankruptcy case, and on September 30, 2016, he filed a motion to reopen his Chapter 13 bankruptcy case. (Pl.'s Suppl. Stmt. of Add'l Material Facts ¶¶ 5-6.) The bankruptcy court granted the motion. (*Id.* ¶ 7.)

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be

---

[3] Under the impression that defendant intended to file a new motion for summary judgment based on the defenses it sought to add to its amended answer, this Court terminated defendant's motion for summary judgment [30] as moot. However, defendant instead chose to file a supplemental memorandum of law and Local Rule 56.1 statement of material facts; it did not file a new motion for summary judgment, although the Court had disposed of the old one. A full round of briefing followed. To ensure that the record is clear, the Court will vacate its August 17, 2016 order to the extent it mooted defendant's motion [30] and rule on the merits of that motion in this Memorandum Opinion and Order.

drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not depose her own witnesses or produce evidence in a form that would be admissible at trial, but she must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in her favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## I.  PLAINTIFF'S BANKRUPTCY AND JUDICIAL ESTOPPEL

Defendant argues that plaintiff should be barred from litigating the claims he asserts in this case based on his failure to disclose them as an asset in his bankruptcy proceedings.

Initially, defendant argued that plaintiff lacks standing to assert these claims because he did not disclose them to the bankruptcy court, but plaintiff subsequently moved to reopen his bankruptcy case, and the bankruptcy court granted the motion. The Court agrees with plaintiff that the reopening of the bankruptcy case cures the standing problem. *See Rainey v. United Parcel Serv., Inc.*, 466 F. App'x 542, 544 (7th Cir. 2012).

Next, defendant argues that plaintiff is judicially estopped from asserting his employment claims against Amica.

> The doctrine of judicial estoppel prevents litigants from manipulating the judicial system by prevailing in different cases or phases of a case by adopting inconsistent positions. *See New Hampshire v. Maine,* 532 U.S. 742, 749 (2001); *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 795 (7th Cir. 2013) (affirming application of judicial estoppel); *Walton v. Bayer Corp.,* 643 F.3d 994, 1002 (7th Cir. 2011). Manipulation may occur when a debtor deliberately conceals a contingent or unliquidated claim during bankruptcy proceedings and then later seeks to profit from that claim after obtaining a discharge of her debts. *See Cannon-Stokes* [*v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006)].

*Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014)

It is undisputed that plaintiff initially omitted to disclose his employment claims as an asset, and he at least potentially stood to gain from the omission. Defendant argues that judicial estoppel applies based on these facts because they show that plaintiff's failure to disclose his claims against Amica was not inadvertent. Defendant cites *United States ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 271-72 (5th Cir. 2015) (judicial estoppel applies against a party who did not act inadvertently, and "inadvertence exists 'only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment'" (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999))), but *Long* and like cases are not binding on this Court. According to the Seventh Circuit, defendant must show that the undisputed facts establish that plaintiff **intentionally concealed** his employment discrimination claims from the bankruptcy court. *See Spaine*, 756 F.3d at 547-48; *see also Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 271-72, 276 (9th Cir. 2013) (cited with approval in *Spaine* and explicitly rejecting the "narrow" approach to judicial estoppel taken by the Fifth Circuit in cases such as *Coastal Plain*s, which presume deceit from the mere incentive to conceal an asset).

Defendant does not point to undisputed evidence demonstrating that plaintiff intentionally concealed his claim from the bankruptcy court. Indeed, plaintiff claims that he had no idea he was supposed to disclose his employment claims to the bankruptcy court, particularly given that his understanding was that all creditors who filed proofs of claim would be paid in full. If that is true, then defendant's judicial estoppel defense fails. Defendant's judicial estoppel defense must await trial because an issue of material fact remains. The motion for summary judgment on grounds of judicial estoppel is denied.

## II. DISABILITY DISCRIMINATION UNDER THE ADA

Plaintiff claims that defendant discriminated against him based on his disability when it terminated him, although he could still perform his job with reasonable accommodations.

The ADA provides, as a "general rule," that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. The statute defines the term "discriminate against a qualified individual on the basis of disability" to include

> **(5)(A)** not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
> **(B)** denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant

*Id.* Thus, "[t]o make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against

her because of her disability or failed to make a reasonable accommodation." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000).

Although defendant is careful not to concede the point (*see* Def.'s Mem. at 4 n. 3, ECF No. 31), defendant does not argue that plaintiff is not disabled. Rather, defendant argues that (a) plaintiff was not qualified to perform the essential functions of his job; (b) there was no reasonable accommodation defendant could have provided or that plaintiff sought; and (c) defendant terminated plaintiff not because he was disabled but because he violated company policy.

### A. Qualified To Perform the Essential Functions of the Job

Defendant argues that plaintiff was not qualified to perform the essential functions of his job because he was unable to report to work. But viewing the evidence in the light most favorable to plaintiff, it distorts the record to say that plaintiff was unable to report to work. Plaintiff was cleared for light duty on October 31, 2013. After that date, but prior to his knee surgery scheduled for November 11, 2013, plaintiff told Grikas that he intended to report to work on light duty three to four weeks after that surgery was completed, and he understood from Grikas that that was acceptable to Amica. (Pl.'s LR 56.1 Resp. ¶¶ 39-41.) Plaintiff was not unable to report to work; he had merely sought an accommodation of a few more weeks of leave to recover from the scheduled surgery, which he had been told was reasonable—and as the Court will discuss in more detail below, there is at least a genuine issue of material fact as to its reasonableness. Viewing the facts in the light most favorable to the non-moving party, plaintiff was not unqualified to perform the essential functions of his job with a reasonable accommodation.

## B. Reasonable Accommodation

When an employer learns that one of its employees is disabled but wishes to remain employed, "the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)); *see also Miller v. Illinois Dep't of Corr.*, 107 F.3d 483, 486-87 (7th Cir. 1997) ("Even if an employee who as here becomes disabled while employed just says to the employer, 'I want to keep working for you-do you have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill."). There is no "hard and fast rule" defining the employer's responsibilities vis-à-vis the employee in this flexible, "interactive process" because

> neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135. Thus, employers must make a good faith effort of reasonable accommodation of an employee's disability. *See Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 602 (7th Cir. 1998); *see also id.* at 601 n. 12 (holding that district court properly instructed jury that defendant must prevail if evidence showed that defendant made a "good faith effort and consulted with the plaintiff to identify and make a reasonable accommodation" that would not cause an undue hardship).

Defendant argues that the leave of absence plaintiff was seeking was too long to qualify as a reasonable accommodation. At the time of plaintiff's termination, in December 2013,

plaintiff had been on leave for almost ten months, and defendant argues that the ADA did not require defendant to extend what was already a lengthy leave of absence any further.

As defendant correctly explains in its briefs, the ADA does not require an employer to accommodate an employee by providing an "indefinite leave of absence." *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998). Additionally, an employer is not "'obligated to tolerate erratic, unreliable attendance.'" *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc) (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999)). However, while plaintiff may have been seeking a generous amount of time off, a reasonable factfinder could conclude that he was neither seeking an indefinite leave of absence nor asking defendant to tolerate erratic, unreliable attendance; to the contrary, he was seeking a more or less clearly defined amount of leave to recover from his surgeries.

According to plaintiff, he conveyed to Grikas that he could return to work on light duty three to four weeks after his November 11 knee surgery, a time period that had already elapsed by the time he was terminated, and plaintiff was actively seeking to return to work on light duty at that time. The parties knew that plaintiff would have to undergo another surgical procedure, a shoulder surgery, after completing his recovery from the knee surgery, and he would need additional disability leave to recover from that surgery. With respect to that future surgery, plaintiff had provided a letter from his doctor explaining what the surgery was, what the recovery process would be like, and approximately how much leave plaintiff would require. *Cf. Yellow Freight Sys.*, 253 F.3d at 948, 950-52 (affirming district court decision that vague and indefinite "request for 'sick days, if needed[,] without being penalized" was not reasonable as a matter of law"). While plaintiff had been on leave for ten months and his upcoming shoulder surgery would require at least an additional six to eight weeks before he could come back on light duty,

there is evidence that other employees at Amica took disability leaves of absence of well over a year, and in two cases as much as sixteen months, which was less than plaintiff was seeking. Importantly, defendant does not dispute that light-duty work, such as "inside bodily injury" work or "desk adjusting," was available to plaintiff.[4] (*See* Def.'s LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 9-10.)

"Consideration of the degree of excessiveness" of a disability leave of absence that an employee seeks as a reasonable accommodation "is a factual issue well suited to a jury determination." *See Haschmann*, 151 F.3d at 602. A jury could reasonably conclude that the leave plaintiff sought was not excessive, particularly considering that Amica allowed other employees to take comparably lengthy disability leaves of absence. Additionally, a jury could reasonably conclude that defendant prematurely cut off the "interactive process" it was required to follow and "dismissed [plaintiff] without making a good faith effort of reasonable accommodation of [his] disability." *Id.* There is a genuine dispute of material fact as to whether the disability leave plaintiff required was a reasonable accommodation.

_____

[4] Although defendant does not dispute that it could put plaintiff on light duty, it vigorously disputes that it could reasonably allow him to work from home. But there is evidence to the contrary (*see* Def.'s LR 56.1 Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 11-12), and in fact, upon close inspection, defendant does not so much deny that plaintiff could have worked from home as deny that, when it has accommodated other employees by allowing them to work from home, it was because they suffered from the same sort of disability as plaintiff. (*Id.*) This is essentially contesting the reasonableness of a work-from-home accommodation under the circumstances of this case, not its availability, and "reasonableness . . . is a classic jury issue" unfit for resolution at summary judgment. *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985), *abrogated on other grounds by Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *see Haschmann,* 151 F.3d at 601 ("The reasonableness of a requested accommodation is a question of fact."); *see also Lenker v. Methodist Hosp.,* 210 F.3d 792, 797 (7th Cir. 2000) ("Whether the hospital tried to reasonably accommodate Lenker with these steps, and whether Lenker cooperated in the hospital's attempts to accommodate him are classic fact questions for the jury to resolve."). In any case, whether a work-from-home accommodation was reasonable makes no difference for purposes of the present motion because it is undisputed that light duty (*i.e.*, desk duty) was available to plaintiff, and there is no evidence that plaintiff would be fit to resume working earlier with a work-from-home accommodation than if he were required to wait till he was fit to report to the Lisle office for light duty. The disputed issue reduces to whether giving plaintiff the amount of disability leave he needed to recover from his surgery before he was fit for light duty was a reasonable accommodation, regardless of whether he performed the light duty at home or at the Lisle office.

### C. Reason for Termination

Defendant claims that it terminated plaintiff for violating company policies against holding outside employment and holding a broker's license, not because of his disability. In response, plaintiff argues that this justification for his discharge is a pure pretext for discrimination based on the following facts: (1) other employees (namely, Gia Henry and Jerry Ann Norton) who held outside licenses but who were not disabled were treated differently; (2) plaintiff had never made any secret of his outside mortgage origination business, and he believed it was common knowledge in the office; (3) there was evidence (namely, the separation agreement sent to plaintiff in September 2013) that Amica was considering firing plaintiff even before it learned of his outside employment and broker's license; and (4) defendant has not shown that plaintiff's mortgage origination business presented a conflict of interest that would plausibly have troubled Amica.

Defendant replies that (1) the other employees who held outside licenses were also terminated, so there is no basis for any argument that they were treated more favorably than plaintiff; (2) there is no evidence that the people who actually participated in the decision to terminate plaintiff had any specific knowledge of plaintiff's mortgage origination business prior to November 2013; (3) that plaintiff was sent a separation agreement as part of a standard severance package is not probative of anything; and (4) regardless of whether plaintiff's mortgage origination business presented a conflict, it clearly violated the Statement of Amica Claims policy, which explicitly warned that violation of the policy was grounds for termination, and there is nothing suspicious about defendant's punishing a violation of its policy with a punishment the policy itself prescribes.

Plaintiff has the better of this argument based on the critical fact that, despite defendant's argument to the contrary, there were significant differences in the way Amica treated plaintiff and the way it treated Gia Henry and Jerry Ann Norton. When Amica discovered that Gia Henry held outside licenses, it gave her an opportunity to save her job by agreeing to cancel the licenses. Amica only fired Henry when it learned, six months later, that despite saying she would cancel the licenses she had never done so. Similarly, when Amica initially learned that Norton held outside licenses to sell insurance for other companies, the view of at least one management member (Dinari Dupont) was that she should be given an opportunity to save her job by cancelling the licenses. At that point, Norton had specifically represented to Amica, in answer to several direct questions, that she was *not* "selling any insurance products outside of Amica." (Pl.'s LR 56.1 Stmt. of Add'l Facts, Pl.'s Grp. Ex. 5, AMICA6396-97, ECF No. 36-5 at 14-15.) She was terminated after Amica learned that in fact she was "actively using a broker's license to sell life insurance for other companies." (Def.'s LR 56.1 Stmt., Tab 1, Palmisano Aff. ¶ 11, ECF No. 32-2 at 3.) A reasonable factfinder could view defendant's treatment of these individuals as revealing that generally, Amica did *not* view a violation of the Statement of Amica Claims policy to warrant dismissal *per se*; barring any use of those licenses to compete directly with Amica or lying about them, merely holding outside licenses was not grounds for termination. Plaintiff's own treatment vis-à-vis his job at the furniture store shows that Amica did not necessarily terminate employees for undisclosed outside employment that did not present a conflict of interest, and defendant has not pointed to any evidence showing, nor does the Court see, that plaintiff's mortgage origination business conflicted with Amica's insurance business. Viewing all the evidence in the light most favorable to plaintiff, a reasonable factfinder could conclude that defendant would not have terminated plaintiff for holding outside licenses and

outside employment if he did not have a disability that required accommodation. There is a genuine issue of material fact on plaintiff's ADA claim, and defendant's motion for summary judgment is denied as to that claim.

## III.  RETALIATORY DISCHARGE

To prevail on a claim of retaliatory discharge under Illinois law, a plaintiff must show that (1) he was discharged (2) in retaliation for his activities, and (3) the discharge violates a clear mandate of public policy. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Id.*  The tort of retaliatory discharge represents a limited and narrow exception to the general rule of at-will employment, *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009), and courts generally sustain claims of retaliatory discharge that arise in one of only two settings: where a whistleblowing employee is discharged in retaliation for reporting illegal or improper conduct, or where, as plaintiff alleges here, "an employee is discharged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act". *Howell v. BNSF Ry. Co.*, No. 14 C 9977, 2015 WL 3528237, at *2 (N.D. Ill. June 4, 2015) (citing *Michael v. Precision Alliance Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014)).

Defendant argues that there is insufficient evidence that plaintiff was terminated in retaliation for filing his workers' compensation claim to create a genuine issue of material fact. Plaintiff was not terminated until December 2013, six months after filing his workers' compensation claim—too long a time frame, according to defendant, for there to be any fair inference of any connection. Further, defendant argues, the only direct evidence of retaliation based on the workers' compensation claim is an ambiguous statement by Ashely Sullivan, a low-level non-decisionmaker, who wrote in an email to Grikas, "[f]rom my perspective, I don't

recommend that we provide a work from home accommodation because this tends to pro-long [*sic*] the [workers' compensation] claim." (Def.'s LR 56.1 Stmt., Tab 5, Grikas Dep., Ex. 7, ECF No. 32-14 at 133). Finally, defendant argues that several other Amica employees have filed workers' compensation claims against Amica in recent years, and none of them has been involuntarily terminated.

Plaintiff responds that he did not merely file a workers' comp claim; in August 2013, he filed an application for adjustment of his claim with the Illinois Workers' Compensation Commission. In other words, he took steps toward litigating his workers' compensation claim in an adversarial context, which, plaintiff argues, gave Amica an even greater reason for retaliatory animus than in the usual case. Further, plaintiff argues, the reason defendant gave for plaintiff's termination was pretextual, so a reasonable factfinder could conclude that defendant lied about its real reason for terminating him in order to cover up its retaliatory motive.

As the Court has explained above in Part III.C. of this Opinion, there is evidence from which a reasonable factfinder could conclude that defendant's reason for terminating plaintiff was pretextual. In short, without repeating all of the above discussion, Amica terminated Gia Henry and Jerry Ann Norton only after they were found to have been dishonest with Amica about their outside employment or licensing, and in neither case did Amica proceed with termination immediately after learning of the outside licenses. In Henry's case, Amica gave Henry an opportunity to cure the violation by canceling the outside licenses, and Amica only fired her after it learned that, despite telling Amica that she would do so, she had not canceled the licenses after all. In Norton's case, Amica was similarly prepared to give Norton an opportunity to cancel the outside licenses to save her job, but it terminated her after learning that she had lied to the company about whether she had been using the licenses to sell insurance

products for other companies, a clear conflict of interest. Plaintiff's situation was quite different; Konkle confronted plaintiff about his outside employment and broker's license, but Amica never gave him an opportunity to save his job by canceling his broker's license, despite the fact that there was no apparent conflict of interest. A reasonable jury could find that Amica has not provided a satisfactory explanation for why it treated plaintiff differently than other employees and conclude that it must have had some other reason for discharging plaintiff so precipitously.

A reasonable jury could conclude that the real reason for plaintiff's termination was not the violation of company policy but the fact that plaintiff had filed a workers' compensation claim against defendant. Buhe had initiated litigation in connection with his workers' compensation claim before the Illinois Workers' Compensation Commission, boosting the potential for retaliatory animus. A jury could interpret Ashley Sullivan's email to show that Amica viewed an extended workers' compensation claim as a problem, and, around the time of plaintiff's termination, Amica had recently received information indicating how long and drawn out the treatment for plaintiff's injuries was likely to be. A jury could reasonably conclude that Amica seized on the pretext of a violation of company policy as soon as it presented itself in order to terminate plaintiff, but that the real reason for the termination was retaliatory animus against plaintiff for pursuing a workers' compensation claim. There is a genuine issue of material fact as to plaintiff's claim of retaliatory discharge, and defendant's motion for summary judgment on this claim is denied.

## IV.    PROMISSORY ESTOPPEL

In addition to the ADA and retaliatory discharge claims, plaintiff's complaint asserts a claim for promissory estoppel based on defendant's alleged breach of its promises in its employee handbook to permit medical leave in excess of six months if necessary. In his

response brief, plaintiff asks to voluntarily dismiss this claim.  Because plaintiff does not wish to pursue his promissory estoppel claim, defendant's motion for summary judgment is granted as to that claim.

## **CONCLUSION**

This Court's August 17, 2016 order [42] is vacated to the extent it mooted defendant Amica's motion for summary judgment [30].  Defendant's motion for summary judgment [30] is granted in part and denied in part.  The motion is granted with respect to plaintiff's promissory estoppel claim; it is otherwise denied.  A status hearing is set for March 6, 2018 at 9:30 a.m.

**SO ORDERED.**                                          **ENTERED:** February 13, 2018

_____
**JORGE L. ALONSO**
**United States District Judge**